## M. A. BROWN v. THE STATE.

### No. 3413.   Decided February 3, 1915.

### Rehearing denied March 10, 1915.

#### 1.—Murder—Continuance—Cumulative Testimony.

Where, upon trial of murder, there was no material difference of the alleged absent testimony as to the probable effect of the wounds inflicted, and the testimony admitted on trial with reference thereto; and, besides, the State offered to admit that the absent testimony was true, there was no error in overruling the motion for continuance. McGrew v. State, 31 Texas Crim. Rep., 336, and other cases.

#### 2.—Same—Examination of Juror—Remarks by Judge.

As the illustrations used by the court in the examination of a juror, who was finally excused by the court, were not such as could have in any way influenced the jurors who were selected, there was no reversible error.

#### 3.—Same—Evidence—Expert Testimony.

Where, upon trial of murder, the State's witness qualified himself as a physician, there was no error in permitting him to give expert testimony regarding the effects of the wound inflicted on deceased.

#### 4.—Same—Evidence—Opinion of Witness.

Upon trial of murder, there was no error in admitting testimony with reference to the blood prints on the door facing of the room near which the killing occurred, and admitting in evidence the section of the door sawed out and identified. Following Turner v. State, 48 Texas Crim. Rep., 585.

#### 5.—Same—Declarations of Defendant.

Upon trial of murder, depending entirely upon circumstantial evidence, there was no error in admitting in evidence the declarations of the defendant shortly after the homicide with reference to deceased, and occurring before his arrest.

#### 6.—Same—Evidence—Appearance and Conduct of Defendant—Res Gestae.

Where, upon trial of murder, the pistol with which the shooting had been done was subsequently found between certain boxes in the store of the defendant near a box of like pistols, there was no error in admitting testimony that after defendant was arrested, shortly after the homicide, he came in the room where the officers were making a search and stood around the boxes where said pistol was found later, and that he was very nervous, and that when he saw them carrying the box beside which the pistol was found and which contained other pistols of like character, he turned pale and flushed up and appeared

very nervous. Following Noftsinger v. State, 7 Texas Crim. App., 301, and other cases.

**7.—Same—Rule Stated—Conduct of Defendant.**

The conduct of the party accused of crime either before or after being charged with the offense indicative of a guilty mind is admissible in evidence. Following Handline v. State, 6 Texas Crim. App., 347, and other cases.

**8.—Same—Evidence—Res Gestae—Conduct of Defendant—Rule Stated.**

Time is not alone the determining factor as to res gestae, but if all the facts and circumstances show the matters to be so connected as to be part and parcel of the transaction and the acts and conduct of the accused spring out of the former part of it, the same are admissible in evidence. Distinguishing Nolen v. State, 14 Texas Crim. App., 474. Following Powers v. State, 23 Texas Crim. App., 42.

**9.—Same—Express and Implied Malice—Charge of Court.**

Where, upon trial of murder, the court properly defined express and implied malice, there was no error in refusing a requested charge on the same subject, and there was no error in defining express and implied malice under the present statute of murder abolishing the degrees of murder.

**10.—Same—Requested Charge—Circumstantial Evidence.**

Where the record did not show that the jury considered or discussed any fact or circumstance not admitted in evidence, there was no error in refusing a special charge not to consider any circumstance not in evidence.

**11.—Same—Exculpatory Statements—Charge of Court.**

Where the statements of defendant admitted in evidence were wholly exculpatory, and the court's charge required the jury that they must find defendant guilty beyond a reasonable doubt from the evidence, it necessarily required a finding that such statements were untrue, and no further charge was required.

**12.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence was entirely circumstantial, the same was, nevertheless, sufficient to sustain the conviction. Davidson, Judge, dissenting.

**13.—Same—Indeterminate Sentence Law—Reforming Judgment.**

Where the lower court failed to apply the indeterminate sentence law, the judgment will be reformed on appeal.

Appeal from the District Court of Hood. Tried below before the Hon. W. J. Oxford.

Appeal from a conviction of murder; penalty, imprisonment for life. The opinion states the case.

*Hickman & Bateman,* for appellant.

*C. C. McDonald,* Assistant Attorney General, for the State.

HARPER, JUDGE.—Appellant was indicted by the grand jury of Erath County. The venue of the cause was changed to Hood County, and appellant when tried was convicted of murder and his punishment assessed at life imprisonment in the penitentiary.

Appellant contends that the court erred in overruling his application for a continuance on account of the absence of Dr. J. R. Sessums. The facts show that deceased, Walter Edwards, was found upstairs in the hall of a store belonging to appellant; that he fell in a crumpled position, and as he lay the cause of death could not be ascertained. Before moving the body both Dr. Bryant and Dr. Sessums were called; when they arrived they had the body moved, and it was then ascertained that death was caused by a bullet wound in the left breast, which penetrated the heart. By the evidence, every other theory as to the cause of death is excluded other than that appellant killed deceased, or deceased either intentionally or accidentally killed himself. As before stated, the body of deceased was found dead in the corner of the hall, near the stair landing; in a room, some twenty-nine feet away, the pistol with which the shot was fired was found between two boxes. The record clearly demonstrates this was the weapon that inflicted the wound. Appellant's contention is, that the circumstances would show, or raise a reasonable doubt that such state of facts might be true, that deceased while upstairs doing some work found the box containing these pistols, and they being of a novel kind, while experimenting with one of them he himself discharged it, dropped the pistol and it fell between the boxes, and then deceased turned and walked the distance from this box to near the head of the stairs and fell.

Of course, the State's contention is that appellant fired the shot; that the nature and character of the wound would render it practically impossible for deceased to have walked that distance after being shot; that if deceased had either intentionally or accidentally himself fired the pistol, that his clothing and body would have been powder burned; that the range of the ball showed it could not have been self-inflicted, etc.

As Dr. Sessums was one of the physicians who had the body moved, and who made the first examination, and afterwards held a post-mortem examination, it is strenuously insisted in this court that his testimony as to the nature and character of the wound would render it far more probable that deceased could walk and travel the distance from where the pistol was found to where the body was found, than would the testimony of Dr. Bryant, who was present and testified on this trial. We have carefully read the testimony of Dr. Bryant in the statement of facts, and what it is stated in the motion for a continuance Dr. Sessums would testify if he was present and we find no material variance.

Dr. Bryant testified that the bullet entered the body between the second and third ribs, not over an inch from the breast bone; that it did not strike a rib on entering the body; that the bullet entered the heart in the upper part of the left auricle, went through the heart and came out at the lower part of the left ventricle, something like an inch from the tip; that the ball entered the left side of the heart, passing through the left auricle and through the left ventricle; then through the lung, through the diaphragm, and then through the left lobe of the liver and into the spleen, cutting a little furrow in the tip of the spleen and struck the eighth rib, dropping into the abdominal cavity.

It is alleged in the application for a continuance that if Dr. Sessums was present he would testify: "I have been practicing medicine 15 or 16 years—I am a graduate of the Medical Department of the University of Texas. I took surgery with my medical course. Since I graduated I have done surgical operations, including some major operations. I remember having been called to look over Walter Edwards after he was killed. I saw him in that position in the corner of the hall right at the door. He was kinder jammed up against the wall like and he was not laying sprawling, but jammed up, his left limb was drawn up, just about come under the wound and the right limb was extended and the right arm over the right knee and he was laying more on his face with his head turned a little to the left. I couldn't say as to how his right foot was—I remember the blood from the wound stained the leg, and he was laying pretty nearly flat with the left leg under him and jammed up against each wall kinder in the corner and his hat was kinder under his head (he was kinder facing the wall). I took hold of Edwards first and helped to move him—I didn't know until then what had killed him—that is the first we knew of what killed him. After I moved him I removed his clothing. I looked at his shirt before I moved him—if there were any powder stains there we couldn't make it out—the hole in the shirt looked like a clear cut—(we thought there might be a little powder burn but we decided there was not, we called that to mind and mentioned it there). We removed the clothing to some extent, we opened the shirt and found the wound, which was located just to the left of the sternum, just to the left of the breast bone, between the second and third ribs; before we probed we thought the bullet went down from the way the upper edge of the wound looked—the indications were it had gone down. We afterwards held an autopsy and obtained the track of the bullet. We made a center incision right through the center—we began up above where the wound was, came down, made the incision and then we separated the ribs from the breast bone and then we cut the ribs along so we could turn them out and expose the viscera of the organs, and after exposing that we began searching or tracing out the route of the bullet. The bullet entered the left auricle, the edge of it. The heart lay in that position like (witness indicated on himself as to the position of the heart) and struck the left auricle and went through that and came out through the edge of the left ventricle, going through the left side; it punctured the lung and then the diaphragm and then through the left lobe of the liver and tore a furrow through the spleen and struck the diaphragm and left rib. Just struck the diaphragm, didn't go through it any more, but we found the bullet free just below the spleen—loose in the abdominal cavity. I took the bullet out. I might have handed the bullet to Will Hallmark— were several there. It strikes me Will Hallmark took the bullet. In my judgment, as a physician, the immediate effect of a gunshot wound such as I have described, would be hemorrhage or shock or paralysis of the heart. In most cases the subject would collapse. Some say the kind of wound I have described produces immediate paralysis. Some

say it produces shock; I couldn't say. Some wounds through the heart are not as fatal as others. I don't know whether the wound I have described struck sufficiently center to be immediately fatal."

If there is any material difference in the testimony of the two doctors, as before said, we have been unable to detect it. In addition to this, the State offered to admit that Dr. Sessums would testify as alleged, and that such testimony is true. Under such circumstances there was no error in overruling the application for continuance. McGrew v. State, 31 Texas Crim. Rep., 336; Fipps v. State, 36 Texas Crim. Rep., 216; Jackson v. State, 48 Texas Crim. Rep., 648.

In the next bill it is shown while J. H. Brazzil, a venireman, was being examined he stated he would not convict upon circumstantial evidence. The court then examined the juryman and stated two illustrations to which appellant objected. This juror was excused by the court, and as the illustrations used by the court were not such as could have in any way influenced the jurors selected in passing on the guilt or innocence of appellant, the bill presents no error.

As Dr. W. B. Goodner had practiced medicine for twenty-seven years, had performed major and minor operations in surgery, and when attending medical school had studied surgery and physiology, the court did not err in holding him competent to testify as an expert witness regarding the effect a wound of the character shown to have caused the death of deceased.

By the record it is shown that Bob Peacock, the constable, was permitted to testify: "I examined the door facings on all those rooms, and I discovered blood prints, or finger prints or thumb prints on the casing of the south door of the northwest room. M. A. Brown has a defective thumb on his left hand. When I found the thumb print or blood mark on the door casing there were several people up there, and I mentioned it to them. I afterwards sawed the panel of this door out and brought it to Stephenville and turned it over to the sheriff. (Witness identifies the door panel just above referred to.) It is now in the same condition it was when I took it away from the building, with the exception that this blood print looks a little dimmer. The blood was fresh on the door when I made the discovery of it. I don't know whether it was the afternoon of same day that we found Walter Edwards dead in the Brown building that I discovered this blood, or the following morning, but it was one of the two. It appeared at that time to be fresh. The defendant's thumb looks to have been mashed and is as broad again at the end as it should be—the thumb is sorter run to a point, on the right hand side. The blood print I find on this board is shown that the point of the thumb is extra large, defective thumb on the right hand side like I described it." This blood was found on the door facing of the room in which the pistol was found and which leads into the hall where the dead body was found. This testimony was properly held admissible, and should not have been excluded on the ground that it was an opinion of the witness. He was testifying to facts as witnessed by him, and here, we might add, there

was no error in admitting in evidence the section of door sawed out and identified. Turner v. State, 48 Texas Crim. Rep., 585.

This is a case depending entirely upon circumstantial evidence. The evidence shows that appellant owned a store; that on the day of the homicide deceased was employed to work, and was at work upstairs. Justice Ables was in this store on business with appellant, and while there deceased came downstairs and got a drink of water, returning to his work. As he left the store Justice Ables looked at his watch and found it was 11:30 a. m., only appellant and deceased being in the store at that time. No one else is shown to have entered the store until after the dead body was found—in fact, the evidence excludes the idea that anyone else was in the store other than appellant and deceased.

Mr. W. H. Sneed testified that he was in business in about one hundred and fifty feet from appellant's place of business; that he heard the shot that killed deceased, and it occurred at 11:40 a. m., which would make it just ten minutes after Justice Ables left. Mr. Sneed fixes the time definitely by saying he had occasion to go out of his store and looked at his watch.

The evidence shows that about five minutes after this appellant appeared on the street and called Mr. Faust and others, and said, "Come quick,—I think Walter Edwards is dead." Several went and found the dead body at the place hereinbefore stated. The evidence makes it clear that appellant was not then arrested and not placed under arrest until he had gone to his dinner and was returning to the store,—the county attorney having arrived, he then had appellant arrested. Consequently everything said and done by appellant up to this time was admissible, and we do not understand appellant's objection reaches any matter that took place prior to this time. In one bill it is shown that after appellant's arrest he went back to the store, and went into the room where the pistol was subsequently found between the boxes, and L. B. Thomas was permitted to testify that appellant came in the room while they were making a search of the room, and went and stood around these boxes where the pistol was later found. That when appellant came in the room and went to these boxes he was "very nervous." Appellant objected to the statement that appellant was very nervous on the ground "it was a conclusion and did not state what appellant did." In another bill it is made to appear that subsequent to this time appellant saw them carrying the box, by the side of which the pistol was found, and which box contained five other pistols of the same character, across the street; that he "turned pale and flushed up and appeared very nervous." To this testimony appellant objected, claiming that the acts and conduct of appellant while under arrest are not admissible. The bills make it clear that no remark or statement of appellant while he was under arrest was admitted, but only his conduct as to being nervous when they were searching the room in which the pistol was found, and when it was found, and the officers were carrying it and the box containing five others like it across the

Vol. 76 Crim.-21

street, appellant turned pale, his face flushed up and he appeared to be very nervous. Mr. Wharton in his excellent work on Criminal Law says: "The effort of the accused to escape or otherwise evade justice is a circumstance admissible in evidence against him from which guilt may be inferred. For the same purpose, confession, prevarication, and embarrassment on the accused's part, when charged with the crime may be put in evidence against him, and so of stolidity and indifference, and whatever would sustain an inference as to complicity in the offense charged."

In the case of Noftsinger v. State, 7 Texas Crim. App., 301, p. 323, it is held: "Criminative or inculpatory circumstantial evidence is derived from the conduct of the party accused, and external objects or physical facts with their appearances as indicative of such conduct. 'Hence,' as is well remarked by Mr. Burrill, 'where a case of suspected crime has become the subject of judicial investigation, and the general fact of the commission of the crime has been ascertained, and particularly where vigorous measures have been set on foot to trace out the individual perpetrator, the idea, now converted into prospect, of discovery, and that becoming a more and more probable event as fact after fact is brought to light, naturally and almost necessarily fills the mind with alarm; particularly where the criminal finds his own person drawn (or is likely to be drawn) within the sphere of investigation. Emotion and agitation exhibited under such circumstances, especially when no charge of guilt has yet been made or insinuated, are regarded, and justly, amongst the most convincing evidences of criminal agency that can be submitted to a human tribunal.' Burrill on Cir. Ev., 466. The court did not err in admitting, or in refusing to strike out, this evidence. Handline v. State, 6 Texas Crim. App., 347; Roscoe's Cr. Ev., 18, 19."

And in the case of Handline v. State, 6 Texas Crim. App., 362, this court held: "On the trial John Dobbin, one of the State's witnesses, proceeded to testify, upon his direct examination, as follows, towit: 'I placed the prisoner at the foot of the coffin.' The defendant here asked the court to instruct the witness not to state anything the prisoner said or did, or how he acted, he then being under arrest. The court, however, permitted the witness to testify as to what the defendant did, and how he acted, by permitting the witness to testify as follows, towit: 'He showed scarcely any emotion whatever until the body was raised, by my order, and placed in a sitting position; he then looked down, and acted as if he was swallowing with his mouth shut.' The witness was permitted to testify as to the acts, only, of the defendant.

"While the confession of a defendant while under arrest shall not, as a general rule, be used against him, the conduct of the party, either before or after being charged with the offense, as indicative of a guilty mind, is proper to be laid before the jury; and Mr. Roscoe says this is a very useful kind of evidence, and one which no judge need seek to withdraw from the consideration of a jury. Roscoe's Cr. Ev., 18, 19."

In Hart v. State, 15 Texas Crim. App., 230, this court said: "As

to the competency and admissibility of the matters testified to as evidence, it seems to be now well settled that any indications of a consciousness of guilt by a person charged with or suspected of crime, or who, after such indications, may be suspected or charged with crime, are admissible in evidence against him; and the number of such indications can not be limited or their nature or character defined. However minute or insignificant they may be, if they tend to elucidate the transaction, they should be admitted. (Whart. Crim. Ev., 8th ed., sec. 751; McArdory v. State, 62 Ala., 154; Handline v. State, 6 Texas Crim. App., 347; Noftsinger v. State, 7. Texas Crim. App., 301; Burrill on Circ. Ev., 466.)"

While the broad rule thus announced has to some extent been limited by the decisions of this court (Nolen v. State, 14 Texas Crim. App., 485), yet in none of them where the acts and conduct are res gestae of the transaction has such testimony been held to be inadmissible. All the evidence in this case goes to show that from the time appellant gave the alarm the minds of all those present were directed to ascertaining first the mode of death, and then continuous search was made to find the weapon, in which appellant participated until his arrest, and then in his presence continued, and it was while this was occurring, and going in the room where the pistol was found, and the carrying it away, caused these manifestations. Time is not alone the determining factor as to res gestae, but if all the facts and circumstances show the matters to be so connected as to be part and parcel of the transaction, and the acts and conduct spring out of and form a part of it, such acts and conduct become admissible as part of the transaction.

In Powers v. State, 23 Texas Crim. App., 42, this question was again before the court, and the testimony held admissible, the court saying: "'Res gestae are events speaking for themselves through the instinctive words and acts of participants, not the words and acts of participants when relating the events. . . . Nor are there any limits of time within which the res gestae can be arbitrarily confined. They vary in fact with each particular case. . . . They need not be coincident as to time if they are generated by an excited feeling which extends without break or let down from the moment of the event they illustrate. In other words, they must stand in immediate causal relation to the act, and become part either of the action immediately producing it, or of action which it immediately produces. Incidents which are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act.' (Whart. Crim. Ev., 8th ed., secs. 262 and 263.) Again he says, 'but we must remember that continuousness can not always be measured by time.' (Id., sec. 264.) And again, 'instinctiveness is the requisite, and when this obtains the declarations are admissible.' (Id., sec. 691; see also Bradberry v. State, 22 Texas Crim. App., 273, and Cartwright v. State, 16 Texas Crim. App., 473.) We are of opinion the evidence was admissible as res gestae." The testimony would clearly be admissible under this case and under all these decisions and the

rules laid down in the text-books the court did not err in admitting the testimony. The writer individually thinks the rule laid down in the Handline case is supported by the great weight of the authority, and should be the rule in a case of circumstantial evidence. Wright v. State, 36 Texas Crim. Rep., 35, but it seems to have been otherwise held in Fulcher v. State, 28 Texas Crim. App., 465.

The court in his charge instructed the jury:

" 'Malice aforethought' is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken.

" 'Malice' is either express or implied.

"Express malice is where one with a sedate, deliberate mind and formed design unlawfully kills another, which formed design is evidenced by external circumstances as preconcerted schemes to do the deceased bodily harm.

"Implied malice is that which the law infers from or imputes to certain acts however suddenly done. Thus when the fact of an unlawful killing is established and the facts do not establish express malice beyond a reasonable doubt or tend to mitigate, excuse or justify the act the law implies malice, and the law does not further define implied malice than if the killing is shown to be unlawful and there is nothing in evidence on the one hand showing express malice, and on the other hand there is nothing in evidence that will reduce the killing below the grade of murder."

Having thus defined "malice aforethought," it was wholly unnecessary to give the special charge requested in regard to that matter, and there was no error in defining both express and implied malice. It is true the degrees in murder have been abolished by legislative enactment, but murder may be committed upon either express or implied malice under the present statute, and a correct definition of those terms is not erroneous.

A special charge was asked, that the jury be instructed not to consider any fact or circumstance not in evidence. If the record disclosed they did consider or discuss any fact or circumstance not admitted in evidence, the matter would present error, but no such showing is even attempted to be made.

The statements of defendant admitted in evidence, made before arrest, were not in the nature of confessions of guilt, but were wholly exculpatory and tended only to show a lack of knowledge of how the death occurred. In requiring the jury to find appellant guilty beyond a reasonable doubt, necessarily required a finding that his protestations as to lack of information as to the cause of death were untrue and no other or further charge was required on that issue than the one given. The facts relied on by the State to show appellant's guilt were that they were the only persons in the store; that deceased was killed with a pistol belonging to appellant, found concealed between two boxes; that there was blood on a paper near the box where the pistols were found; that there was no blood found from the point where the pistol was found

to the point where the body was found, except on the door-facing made by someone placing his hand on the facing, as one might make in passing out; that the peculiar imprint made on the door-facing showed a peculiar formation of a thumb,—a broad thumb, deformed on one side. Appellant is shown to have had that kind of a thumb; that it is not probable that a person shot as was deceased could have gone from the box where the pistol was found to the place where the dead body was found, but that instead death would be almost, if not instantly instantaneous. We have studied the record, and it conclusively excludes the idea that anyone else other than appellant or deceased fired the shot, and to our minds it authorized the jury to find as positively that it excluded the idea that deceased could have either intentionally or accidentally fired the shot. The range of the bullet as traced show it to have been practically impossible for one to so hold the pistol as to inflict the wound. While it may be said that the evidence to show motive is slight, but in the absence of motive being shown, and in a case of wholly unexplained killing, the homicide has always been held to be murder upon implied malice, and as the jury is now authorized to assess the same punishment whether the killing is upon express or implied malice, we have come to the conclusion we would not be authorized to disturb the verdict.

In this case the verdict of the jury found the appellant guilty of murder and assessed his punishment at confinement in the penitentiary for life. The sentence, based on this, fixed the punishment specifically at life imprisonment instead of an indeterminate sentence as required by the Act of August 18, 1913, page 4. The sentence will, therefore, be reformed by this court so that the punishment of appellant will be assessed at the indeterminate sentence and time of not less than five years nor more than for his lifetime. The sentence is, therefore, reformed in accordance with said Act, and the clerk of this court is directed to enter the proper sentence in accordance with this opinion and said law, and certify the same properly to the court below.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied March 10, 1915.—Reporter.]

DAVIDSON, Jᴜᴅɢᴇ.—I do not agree to this affirmance. The facts are not sufficient. The evidence is voluminous and a collation of same would serve no useful purpose to our jurisprudence. The circumstances do not meet the requirements of the law of circumstantial evidence.